## WERNER K. GABLER, Appellant, v.
## DOROTHY I. GABLER, Respondent.

No. 3923

December 14, 1956                    304 P.2d 404

(Petition for rehearing denied January 25, 1957.)

*Jack Streeter*, of Reno, for Appellant.

*Vargas, Dillon & Bartlett*, of Reno, for Respondent.

## OPINION

By the Court, Merrill, C. J.:

This is an action for divorce. The husband has appealed from a decree in favor of the wife, granting

her a divorce and custody of the minor child of the parties, together with an allowance for child support. The sole question which we reach in this opinion is whether, under our rule of comparative rectitude, it was available to the trial court upon the record to award a decree of divorce to the wife as the party less at fault. Sec. 9467.01, N.C.L., 1931–1941 Supp., provides as follows: "In any action for divorce when it shall appear to the court that both husband and wife have been guilty of a wrong or wrongs, which may constitute grounds for a divorce, the court shall not for this reason deny a divorce, but in its discretion may grant a divorce to the party least in fault."

The wife charged the husband with extreme cruelty, mental in character. The husband charged the wife with adultery and asked that the divorce be denied. As to both charges the proof was confined to the testimony of the wife and is undisputed. Upon cross examination she admitted that commencing in 1954, eight years after marriage and one year prior to suit, she had engaged in acts of adultery with a specified married person, father of two children.

It cannot be said today that for historical, moral or ecclesiastical reasons, adultery must, per se, be held a graver matrimonial delict than cruelty. The degree of fault in each party must be determined under the facts of the particular case.

In the case at bar it may be noted that the wife's infidelity was not an isolated or spontaneous instance. While her examination was lacking in detail, it gives rise to an implication, unrebutted, that the adultery amounted to or approached a deliberate course of conduct.

The wife's testimony with reference to her husband's acts of extreme cruelty is brief and we quote it in full.

"Q. Mrs. Gabler, can you describe for us the conduct on the part of your husband which you stated constituted extreme cruelty.

"A.  Shortly after we were married, approximately a year and a half, I felt that something was wrong with our marriage, and I couldn't quite figure out what it was; and I tried to talk to Werner about it, and he just laughed and said that there was nothing wrong, and I wasn't busy enough, I should get a job or do something to keep me busy. I tried all those things; I worked in his office for him, and continuously tried to talk to him, and he refused all the time, and it just went on like that for years.

"I also felt that perhaps if we were able to have children it would alleviate the matter, although we didn't have any until we were married four years; and when Audrey was born he didn't seem interested in her very much, or me. His business seemed to be the only thing that really meant very much to him. I was something pretty to look at and to entertain his friends, he had a nice little daughter, and that's about all I seemed to mean to him.

"Then as the years went on, I felt that he sexually was not interested in me at all, and I worried about this, too; and all the time every effort I made to talk to him I just couldn't get through to him; and he would say, 'Well, that's silly'; he'd laugh at me, and then the moment would pass again.

"Then during our married life Werner bought a dog, an English Pitt Bull Terrier, which is a very strong, very nervous type dog. He imported it from England. And I was in deathly fear of this dog all the time. He became very attached to Werner, and whenever Werner was out of the house I couldn't control him. Our friends were all frightened of him; whenever anyone came around we had to lock the dog up. And three times when Werner was away I had to put Minor in a kennel because I was afraid he was going to bite me or Audrey or some of our friends. And when I tried to talk to him about this, he absolutely couldn't understand what I meant. He said, 'Well, you don't give the dog enough love, enough attention.' I just couldn't cope with this dog and manage the

house and Audrey and work in his office and everything all at the same time. This went on for about two and a half, nearly three years, and finally the dog bit our maid; and Werner then finally thought, I suppose, it was time to get rid of him, and he finally sold him.

"I also felt that there was something lacking in Werner's and my married life with regard to religion. He always belittled everything I thought about it. I felt that we should go to church and, seeing as we had a little girl, we should bring her up to believe in God, things like that, and he just wouldn't even talk to me about it. It was one of those things that would come up, just as I always tried to talk to him, he just laughed at me.

"Q. Now, did this refusal to talk to you, did that cause you to feel extremely frustrated?

"A. Well, completely. I just felt that it was a very important part in our married life that we couldn't get to, and the fact that he wouldn't talk to me was to me the frustrating part of it.

"Q. And how did it affect your health, Mrs. Gabler, with reference to being nervous or upset?

"A. Well, I realized, particularly after Audrey was born, that I became very nervous all the time, and hated to be alone; and I went to the doctor, and I said, 'This is silly; is there something wrong with me? I'm afraid to stay alone in the house and things like that.'

"And I always had a cold, felt miserable all the time, and became in such a state, apparently, that I got pneumonia three times. The doctor told me I should leave Audrey and Werner and the house and go away for a rest somewhere, but it wasn't possible, we had work to do at the office, and I just had to stay around and look after things.

"Q. Do you believe that that health problem was caused by his conduct in not being willing or able to discuss these matters with you?

"A. Yes, I do.

"Q. And particularly with reference to the baby's—

the time Audrey was born, was there anything that happened then that caused difficulty?

"A. Well, I had felt that maybe a child would be the thing that Werner and I needed to keep us together; and then when she was born, I looked forward to it so much, and expected that Werner did, too; but the night she was born he wasn't at the hospital even, and the doctor couldn't find him to tell him that he had a small daughter. He apparently was out with friends of ours drinking. And then when I came home from the hospital I found the house full of empty glasses, and, well, all the signs of a party the night before, which he told me he had had. I felt that it meant so much to us, this child— Well, it just didn't seem right to me. I was very hurt and upset by that, although—that's about all I have to say about that."

Without disregarding the specified instances of inconsiderate action, the gravamen of the husband's offense —that which the wife believed to have caused her feeling of frustration and to have affected her health—was his refusal to discuss with her certain matters which troubled her.

On examination of this testimony we note that while the wife felt that something was wrong with the marriage, she does not charge her husband with fault in this respect for she could not herself figure out what it was that was wrong. Even at the time of trial she apparently had not solved this problem sufficiently to specify it. While she felt that her husband had lost interest in her sexually and otherwise, we do not know the facts upon which this feeling was based or whether, in the face of her husband's laughing denial, it was at all reasonable. The husband's fault apparently lay in his refusal to aid his wife in her inquiry, he apparently being of the belief that if you yourself see nothing wrong with your marriage there is little profit or point in searching out sources of trouble.

Appellant husband contends that this proof is insufficient to establish grounds for divorce, even in the absence of recrimination. Our problem, however, is more simply resolved. We conclude only that such casual and scanty proof wholly fails to provide any support whatsoever for a determination by the trial court that the husband in this case is the party greater in matrimonial fault.

Reversed and remanded with instructions that judgment be entered for the defendant in accordance with the prayer of his answer. No costs are allowed.

BADT and EATHER, JJ., concur.